# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MKE HOLDINGS LTD. and DAVID W. BERGEVIN, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | C.A. No. 2018-0729-SG |
| KEVIN SCHWARTZ, DAVID BUCKERIDGE, ANGELOS DASSIOS, DAVID BROWNE, ROBERT BERENDES, JEFFREY R. GROW, KENNETH AVERY, ADAM FLESS, ALEXANDER CORBACHO, and PAINE SCHWARTZ PARTNERS, LLC, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| VERDESIAN LIFE SCIENCES, LLC, | ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: June 17, 2019
Date Decided: September 26, 2019

Thomas E. Hanson, Jr., of BARNES & THORNBURG LLP, Wilmington, Delaware, *Attorney for Plaintiffs*.

Blake Rohrbacher, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: John F. Hartmann and Abdus Samad Pardesi, of KIRKLAND & ELLIS LLP, Chicago, Illinois, *Attorneys for Defendants and Nominal Defendant*.

GLASSCOCK, Vice Chancellor

This matter requires me to construe an LLC operating agreement. My father was an engineer. He frequently remarked that machinery would not be so poorly designed if the designer were condemned personally to keep it operating.[1] I am a lawyer. I am struck that LLC agreements would be better drafted if the drafters were compelled to litigate over them, or worse, construe them as judges. In any event, such is the task I must undertake here.[2]

This suit was brought derivatively by members of an LLC, Verdesian Life Sciences, LLC ("Verdesian"), alleging breaches of duty by the managers under Verdesian's operating agreement. That agreement attempts to supplant common-law fiduciary duties by imposing contractual duties, in a manner I found, at first read, confusing and internally inconsistent. Before me is the Defendants' Motion to Dismiss. After harmonizing the provisions of the LLC agreement and applying contractual duties to the facts alleged, I find the Defendants' Motion must be granted. The Plaintiffs also bring direct claims. Those claims will be addressed in a separate opinion.

My reasoning is below.

---

[1] ". . . with nothing but a screwdriver and a rusty pair of pliers."
[2] With nothing but an aging brain and a no. 2 pencil.

# I. BACKGROUND

I draw the following facts from the Plaintiffs' First Amended Verified Complaint (the "First Amended Complaint") and to a limited extent documents incorporated therein.[3] The allegations of the First Amended Complaint, as discussed below, are assumed true for purposes of this Motion.

## A. *The Parties*

Plaintiff MKE Holdings, Ltd. ("MKE") is an Indiana corporation and a Member of Nominal Defendant Verdesian.[4] MKE holds 261,887 Class A Units of Verdesian.[5]

Plaintiff David W. Bergevin[6] founded Northwest Agricultural Products, LLC in 1989.[7] Bergevin sold Northwest Agricultural Products, LLC to Verdesian in 2013, and, as a result of the acquisition, became a Member of Verdesian.[8] Bergevin holds 365,471 Class A Units of Verdesian.[9]

---

[3] The incorporated documents are the LLC operating agreement of Verdesian, a KPMG report on a potential acquisition by Verdesian, and a presentation on the same acquisition provided to members of Verdesian. I note that these documents, and others, were produced to Plaintiff MKE Holdings, Ltd. by the Defendants pursuant to a books and records demand, production which was made by agreement that the documents would be considered incorporated in any future litigation between the parties. *See* Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 2; *see also* June 17, 2019 Oral Arg. Tr. 112:17–113:2.

[4] First Am. Compl. ¶ 12.

[5] *Id.*

[6] Bergevin is a resident of the State of Washington. *Id.* ¶ 13.

[7] *Id.* ¶ 36.

[8] *Id.*

[9] *Id.* ¶ 13.

2

Nominal Defendant Verdesian is a Delaware limited liability company with a principal place of business in Cary, North Carolina.[10] It was formed by Defendant Paine Schwartz Partners, LLC ("Paine") in 2012.[11] Verdesian develops, licenses, manufactures, markets, and distribute fertilizers, pesticides, and related agricultural products.[12] It employs a business strategy focused on acquisition, targeting "companies holding proprietary specialty plant health technologies."[13] Verdesian is managed by an eight-member Board of Managers (the "Board of Managers," or, the "Board"), and each member of the Board is appointed by the "Paine Members," a group of entities defined in Verdesian's LLC operating agreement, as described in more detail below.[14]

Defendant Paine is a Delaware limited liability company with a principal place of business in San Mateo, California.[15] Paine was founded in 2006[16] and is a successor entity to Fox Paine & Company ("Fox Paine").[17] Affiliates of Paine own over seventy percent of the Class A Units of Verdesian.[18] Paine also has a

---

[10] *Id.* ¶ 24.
[11] *Id.* ¶ 26.
[12] *Id.*
[13] *Id.*
[14] *Id.* ¶ 29; *see also* Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 1, Second Amended and Restated Limited Liability Company Agreement of Verdesian Life Sciences, LLC, dated June 20, 2014 [hereinafter Operating Agreement].
[15] First Am. Compl. ¶ 23.
[16] *Id.* ¶ 14.
[17] *Id.*
[18] *Id.* ¶ 27.

contractual relationship with Verdesian whereby Paine is paid management service fees based on Verdesian's financial performance, and paid transaction fees on certain Verdesian acquisitions.[19]

Defendant Kevin Schwartz is the President, Chief Executive Officer ("CEO"), and a Founding Partner of Paine.[20] Schwartz has served as a Manager of Verdesian since August 2012.[21]

Defendant David Buckeridge is a Partner at Paine, and previously was the Operating Director of Fox Paine.[22] Buckeridge has served as a Manager of Verdesian since August 2012.[23]

Defendant Robert Berendes is the Operating Director of Paine.[24] Berendes has served as a Manager of Verdesian since August 2014.[25] Berendes has worked at, among other places, McKinsey & Company ("McKinsey"). He is also the Chairman of the Board of Directors of Indigo Ag, Inc. ("Indigo), a potential competitor to Verdesian.[26]

---

[19] *Id.* ¶ 54.
[20] *Id.* ¶ 14.
[21] *Id.*
[22] *Id.* ¶ 15.
[23] *Id.*
[24] *Id.* ¶ 16.
[25] *Id.*
[26] *Id.*

Defendant Jeffrey R. Grow is the Chairman of Verdesian and served as its CEO from August 2012 to September 2016.[27] Grow has served as a Manager of Verdesian since August 2012.[28]

Defendant Kenneth Avery is the current CEO of Verdesian, replacing Grow in September 2016.[29] Avery has served as a Manager of Verdesian since September 2016.[30]

Defendant Adam Fless is the Managing Director of Paine.[31] Fless has served as a Manager of Verdesian since August 2017.[32]

Defendant Alexander Corbacho is a Principal of Paine.[33] Corbacho has served as a Manager of Verdesian since August 2017.[34]

Defendant Angelos Dassios is a Partner at Paine.[35] Dassios served as a Manager of Verdesian from 2012 to 2016, and continues to serve as a member of the Board of Manager's audit committee.[36]

---

[27] *Id.* ¶ 17.
[28] *Id.*
[29] *Id.* ¶ 18.
[30] *Id.*
[31] *Id.* ¶ 19.
[32] *Id.*
[33] *Id.* ¶ 20.
[34] *Id.*
[35] *Id.* ¶ 21.
[36] *Id.*

Defendant David Browne is a former Director of Paine, a position he left in June 2017.[37] Browne served as a Manager of Verdesian from 2012 to 2017, and continues to serve as a member of the Board of Manager's audit committee.[38]

*B. Verdesian Life Sciences, LLC's Operating Agreement*

Verdesian was formed in August 2012 to sell agricultural products, such as fertilizers and pesticides, the rights to which it planned to obtain through an acquisition strategy targeting entities with proprietary technology.[39] According to Verdesian's Operating Agreement (the "Operating Agreement"), the "full and exclusive discretion" to "manage and control, have the authority to obligate and bind, and make all decisions affecting the business and assets of [Verdesian]" was vested in the Board of Managers.[40] "Members" of Verdesian are listed in the Operating Agreement, and include, among others, MKE and Bergevin.[41]

### 1. The Board of Managers of Verdesian

The Board of Managers—per the Operating Agreement—consists of up to eight members (each individually a "Manager", and collectively, the "Managers")[42] and the current Board has seven members.[43] All Managers are appointed by the

---

[37] *Id.* ¶ 22.
[38] *Id.*
[39] *Id.* ¶ 26.
[40] *Id.* ¶ 29; Operating Agreement § 6.1.
[41] Operating Agreement, Appendix B, "Member."
[42] First Am. Compl. ¶ 29; Operating Agreement § 6.2(a).
[43] First Am. Compl. ¶ 29.

"Paine Members,"[44] which is a defined term in the Operating Agreement meaning "Paine & Partners Capital Fund III AIV III, L.P., Paine & Partners Capital Fund III Co-Investors, L.P., Verdesian Co-Investment, L.P. and Verdesian Co-Investment Blocker, Inc."[45] The Paine Members, all affiliates of Paine, own over seventy percent of the Class A Units of Verdesian.[46]

According to the Operating Agreement, a "Manager shall perform his duties as a manager in good faith, in a manner he reasonable believes to be in or not opposed to the best interests of the Company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances."[47] However, this standard is explicitly subject to another subsection of the Operating Agreement, whereby:

> . . . whenever in this Agreement a Manager or Member is permitted or required to make a decision (i) in its, his or her discretion or under a grant of similar authority, such Manager or Member shall be entitled to consider only such interests and factors as such Manager or Member desires, including its, his or her own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its his or her good faith or under another

---

[44] *Id.*

[45] Operating Agreement, Appendix B, "Paine Members." The Operating Agreement technically indicates that the Paine Members have the right to appoint six of the eight Managers; the remaining two are appointed by the "Rollover Members," unless the "Rollover Members" ownership drops below fifteen percent, in which case, those two remaining Managers are appointed "by the Members owning a majority of the outstanding Units." *Id.* § 6.2(a).

[46] First Am. Compl. ¶ 27.

[47] *Id.* ¶ 30; Operating Agreement § 6.4(b).

express standard, such Manager or Member shall act under such express standard and shall not be subject to any other or different standards.[48]

Additionally, the Members, by agreeing to the Operating Agreement, "acknowledge that the Managers may or could have conflicts of interest to the extent that they are requested or obliged to make decisions . . . with respect to . . . the rights of the Members."[49] The Members "to the fullest extent permitted under the LLC Law . . . waive any such conflicts of interest directly or indirectly associated with decisions, and agree that each such Manager shall be entitled to make decisions and determinations as Member or Manager in his, her or its self-interest."[50]

Further according to the Operating Agreement, "to the extent that, at law or in equity, a Manager . . . has duties, including fiduciary duties, and liabilities relating thereto to the Company . . . such Person acting under this Agreement shall not be liable to the Company . . . for its good faith reliance on the provisions of this Agreement . . . ."[51] Furthermore, "[n]otwithstanding anything contained in this Agreement to the contrary, to the fullest extent permitted under the LLC Law, the Members of Verdesian hereby waive any fiduciary duty of the Managers, so long as such Person acts in a manner consistent with [the Operating Agreement]."[52]

---

[48] Operating Agreement § 6.4(e).
[49] *Id.* § 6.9(b).
[50] *Id.*
[51] *Id.* § 6.9(a).
[52] *Id.* § 6.9(b).

8

The Operating Agreement also provides that Managers, as "Covered Person[s]," are not liable "to the Company . . . for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement."[53] Managers, specifically, are also not liable "to the Company or to any Member for any actions taken in good faith and reasonably believed to be in or not opposed to the best interests of the Company, or for errors of judgment, neglect or omission."[54]

The Managers are charged with managing "the affairs of [Verdesian]."[55] Under the Operating Agreement, Verdesian will "[c]ause to be prepared and distributed to each Member holding Class A, Class A-1 or Class A-2 Units audited annual financial statements within ninety (90) days after the end of each fiscal year or as soon thereafter as is reasonably practicable and monthly unaudited financial statements within forty-five (45) days after the end of each month."[56]

---

[53] *Id.* § 6.7(b).
[54] *Id.* § 6.4(d).
[55] *Id.* § 6.4(a).
[56] First Am. Compl. ¶ 31; *see also* Operating Agreement § 7.2(e).

*C. MKE and Bergevin Become Members of Verdesian*

After its formation in August 2012, Verdesian made its first acquisitions between September 2012 and April 2013.[57] Verdesian acquired Biagro Western Sales, Inc. ("Biagro"),[58] Northwest Agricultural Products, LLC ("NAP"),[59] and Plant Syence Ltd. ("Plant Syence").[60] NAP was founded by Plaintiff Bergevin in 1989.[61] Verdesian acquired NAP from Bergevin in February 2013 for $34 million.[62]

Bergevin invested $7 million of the proceeds of his sale of NAP back into Verdesian.[63] Bergevin received 278,441 Class A Units and became a Member of Verdesian.[64] Bergevin also became a guest of the Board of Managers.[65]

Verdesian later acquired INTX Microbials, LLC ("INTX"),[66] which was formed in 2002, from Plaintiff MKE in a two-part transaction, one part in September 2013, and the second part in January 2014.[67] Verdesian acquired INTX from MKE

---

[57] First Am. Compl. ¶ 34.
[58] "Biagro . . . manufactured and sold phosphite plant nutrition and fertilizer products, including Nutri-Grow and Nutri-Phite." *Id*. ¶ 35.
[59] "NAP . . . offer[ed] specialty agricultural products, including Sterics, which enhance the absorption of phosphorous, and PolyAmines, an amino acid that delivers essential micronutrients." *Id*. ¶ 36.
[60] *Id*. ¶ 34. "[Plant] Syence . . . was a supplier of plant nutritional solutions to the agriculture and horticulture markets." *Id.* ¶ 35.
[61] *Id*. ¶ 36.
[62] *Id*.
[63] *Id*.
[64] *Id*.
[65] *Id*.
[66] "INTX . . . manufactured biological products for agricultural crop production. Among other products, INTX offered legume seed inoculants, biological growth promoters and adjuvants for agriculturally applied pesticides." *Id*. ¶ 37.
[67] *Id*. ¶¶ 37–38.

for $32 million.[68]  MKE invested $5 million of the proceeds of its sale of INTX back into Verdesian.[69]  MKE received 198,887 Class A Units and became a Member of Verdesian.[70]  MKE's principal also became a guest of the Board of Managers.[71]

Verdesian's revenue for 2013 was $53 million and it had an Adjusted EBITDA in 2013 of $14.5 million.[72]  Paine received management fees from Verdesian of $196,630 in 2013.[73]  Paine also received, in 2012 and 2013, a combined $3.7 million in transaction fees related to Verdesian's acquisition of Biagro, NAP, Plant Syence, and INTX.[74]

*D. Verdesian's Acquisition of Specialty Fertilizer Products, LLC*

During a May 15, 2014 meeting of the Board of Managers, Verdesian's management announced it had executed a purchase agreement to acquire Specialty Fertilizer Products, LLP ("SFP") for $313.5 million.[75]  SFP's revenue for 2013 was $68.1 million and it had an Adjusted EBITDA of $26.6 million.[76]

---

[68] *Id.* ¶ 37.

[69] *Id.* ¶ 38.

[70] *Id.*  Verdesian first purchased sixty-five percent of INTX in September 2013, and at that time MKE reinvested $3 million into Verdesian.  *Id.*  Verdesian purchased the remaining thirty-five percent of INTX in January 2014, at which time MKE reinvested $2 million into Verdesian.  *Id.*

[71] *Id.*

[72] *Id.* ¶ 40.

[73] *Id.* ¶ 54.

[74] *Id.*

[75] *Id.* ¶¶ 43, 52.  "SFP was a wholesaler of plant health products and fertilizers to retailers in the Midwest."  *Id.* ¶ 43.

[76] *Id.* ¶ 43.

## 1. Concerns Related to the Specialty Fertilizer Products, LLC Acquisition

On April 10, 2014, as part of the SFP acquisition, KPMG prepared a due diligence report for Verdesian.[77] KPMG's report (the "KPMG Report") noted that year-to-date sales for SFP in March 2014 were fifteen percent lower than for the same period the previous year.[78] The KPMG Report also detailed SFP's introduction "in the second half of [fiscal year] 2013" of a "bulk and early fill sales program."[79] Prior to this program, SFP's "sales season peaked in spring during the planting season."[80] The bulk and early fill sales programs "incentiviz[ed] dealers with discounts" in order "to increase dealer demand, accelerate business growth, enhance operational capacity and allow access to a high volume market."[81] According to KPMG, the 2013 "programs were successful and, as a result, sales peaked a second time in FY 13 during Q3 and Q4."[82] In other words, SFP's 2013 sales results included two sales peaks.[83] KPMG noted that there was "a risk [that] this double sales peak will not recur next year," as the bulk and early fill programs had

---

[77] *Id.* ¶ 46.
[78] *Id.*
[79] *Id.* ¶ 47.
[80] *Id.*
[81] *Id.*
[82] *Id.*
[83] *Id.*

accelerated sales from the first quarter of 2014 into the fall of 2013.[84]  As a result,

KPMG wrote, "FY 13 includes a onetime benefit due to the business shift."[85]

United Suppliers, Inc. ("United Suppliers"), one of SFP's primary retail

customers, also provided commentary on SFP.[86]  United Suppliers warned Verdesian

that SFP had presold a significant amount of product in 2013, and would therefore

be unable to achieve the same level of sales in the future.[87]  In other words, United

Suppliers represented to Verdesian's Managers that SFP had "stuff[ed] the

channel."[88]  United Suppliers did, however, expect its order with SFP to increase

year-over-year.[89]

### 2. Verdesian Proceeds with the Specialty Fertilizer Products, LLC Acquisition

With knowledge of the KPMG Report and the communications with United

Suppliers, Verdesian's Managers decided to acquire SFP.[90]  Verdesian funded the

$313.5 million acquisition of SFP through $200 million in third-party debt financing

and $160 million in new equity financing.[91]  On June 1, 2014, as part of the new

equity financing, Verdesian issued a "Notice of Preemptive Rights" and offered its

---

[84] *Id.*
[85] *Id.*
[86] *Id.* ¶ 49.
[87] *Id.*
[88] *Id.* ¶ 49–50.
[89] Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 4, Report from KPMG titled 'Project Fertilizer,' dated April 10, 2014, at 9.
[90] First Am. Compl. ¶ 51.
[91] *Id.* ¶¶ 52, 103.

existing unitholders the opportunity to purchase additional Class A Units at a price of $47.11.[92] In soliciting this new equity financing from Verdesian's Members, the Managers did not specifically disclose the findings of the KPMG Report or the communications with United Suppliers.[93] Instead, the Managers indicated that SFP's 2013 earnings were a reliable indicator of its future performance.[94] The Managers also sent to the Members a presentation on the SFP acquisition, prepared for the rating agencies, which indicated that "SFP underperformance y-o-y driven in part by transition of portion of business from spring planting season to autumn as part of an Early Fill program. Expect meaningful uptick in summer and fall months."[95] The Managers also represented to the Members that Verdesian, with SFP, would have an enterprise value of $514 million.[96]

In connection with the new equity financing, MKE contributed $3 million and Bergevin contributed $4.1 million.[97] The SFP acquisition closed on July 1, 2014.[98]

Paine, by contract, receives a management service fee based on Verdesian's financial performance and transaction fees on certain Verdesian acquisitions.[99]

---

[92] *Id.* ¶ 103.
[93] *Id.* ¶ 52.
[94] *Id.* ¶ 104.
[95] Defs.' Opening Br. in Support of Defs.' Mot. to Dismiss Pls.' First Am. Compl., Ex. 7, Verdesian Life Sciences LLC Ratings Agency Presentation, dated May 2014, at 48.
[96] First Am. Compl. ¶ 104.
[97] *Id.* ¶ 52.
[98] *Id.* ¶ 51.
[99] *Id.* ¶¶ 28, 54.

14

Accordingly, Paine received a transaction fee of $6 million for Verdesian's acquisition of SFP.[100] In 2014, Verdesian's Adjusted EBITDA (including SFP) was $45.3 million.[101] In 2014 and 2015, following the acquisition of SFP, Paine received management service fees of $1,145,053 and $1,205,798, respectively.[102] In 2013, Paine had received a management service fee of less than $200,000.[103]

### E. Verdesian Acquires QC Corporation

On September 30, 2014, Verdesian acquired QC Corporation ("QC") from Paine.[104] Paine had previously acquired QC and managed it separately from Verdesian.[105] QC had environmental liabilities (mostly related to neighboring properties and employees) as well as other liabilities, which are now borne by Verdesian.[106] As of August 31, 2017, QC holds an intercompany loan receivable of $18 million.[107]

### F. The Management of Verdesian

#### 1. The Officers

Defendant Grow, who served as Verdesian's CEO from August 2012 to September 2016, received bonus compensation from 2014 to 2016 totaling more

---

[100] *Id.* ¶ 54.
[101] *Id.* ¶ 152.
[102] *Id.* ¶ 54.
[103] *Id.*
[104] *Id.* ¶ 58.
[105] *Id.*
[106] *Id.* ¶ 59.
[107] *Id.*

than $1 million and received option grants of 228,055 Class M-1 Units and 97,968 Class M-2 Units.[108]

Defendant Avery, who took over as Verdesian's CEO in 2016, received 65,000 Class M-1 Units in 2016.[109] Avery's hire as CEO, to replace Grow, was made with little Board deliberation.[110] Directly before becoming Verdesian's CEO, Avery worked for Monsanto Company, and previously worked for Delta and Pine Land Company, Eagle Materials, and Arthur Anderson.[111] Avery had previously been suspended from practicing before the Securities and Exchange Commission.[112]

In 2013, the Managers hired as Verdesian's Chief Financial Officer ("CFO") non-party Frank Pirozzi ("Pirozzi"), who had no prior experience as a CFO or with mergers and acquisitions.[113]

2. Operating Performance in 2016 and 2017

In August 2016, Verdesian performed an "Operational Expenses Assessment," which recommended a reduction in workforce and changes in Verdesian's management structure.[114] The Assessment also noted that "Verdesian's total cost (salary, bonus, T&E) for corporate services and sales force are high for

---

[108] *Id.* ¶ 55.
[109] *Id.*
[110] *Id.* ¶ 66.
[111] *Id.* ¶ 18.
[112] *Id.* ¶ 66.
[113] *Id.* ¶¶ 63, 65.
[114] *Id.* ¶ 68.

this size company in this space."[115] Since Avery has taken over as CEO, and under the Managers' control, Verdesian has continued to engage in advance sales of products at discounted prices, has changed financial reporting practices (related to finished goods inventory and accrual for product returns), and has consistently paid bills late.[116]

Verdesian's year-to-date EBITDA in August 2016 was $15.3 million.[117] Its EBITDA for the same period in August 2017 had dropped to $6.92 million.[118] Even as Verdesian's operating performance has declined, as measured by Adjusted EBITDA or EBITDA, the Managers of Verdesian have spent liberally on corporate perks, corporate meetings, and corporate retreats.[119]

On June 28, 2017, Moody's downgraded Verdesian's credit ratings and indicated a negative ratings outlook.[120] S&P Global Ratings would also later lower its credit rating for Verdesian on January 9, 2019.[121]

In 2018, Verdesian hired McKinsey to develop initiatives to drive sales and reduce costs.[122] McKinsey was paid over $900,000 for its work, and the initiatives

---

[115] *Id.* ¶ 68 (internal quotations omitted).
[116] *Id.* ¶ 70.
[117] *Id.* ¶ 69.
[118] *Id.*
[119] *Id.* ¶¶ 72–73.
[120] *Id.* ¶ 74.
[121] *Id.* ¶ 87.
[122] *Id.* ¶ 86

it developed purported to provide the opportunity for a $6 million increase in 2018 revenue.[123] Verdesian derived no material benefit from McKinsey's initiatives.[124]

### G. Verdesian's Class P Offering

MKE received its K-1 for 2016 for Verdesian in May 2017, and afterwards inquired to the Managers about the loss in value of its interest in Verdesian due to Verdesian's poor performance.[125] Instead of addressing Verdesian's performance, the Managers responded that Verdesian was being positioned for a sale.[126] The Managers represented that a sale was being targeted for the fourth quarter of 2018 or the first quarter of 2019, and that Class A unitholders would be able to recoup their investments in such a sale.[127] Verdesian's Adjusted EBITDA for 2017 was $30.2 million.[128]

On August 20, 2018, Verdesian issued an Offering Notice to its Members, notifying them of its intent to issue a new class of preferred units, Class P Units.[129] Each Class P Unit would be offered at $44.30 per unit.[130] At that price, Verdesian was valued at a six percent loss relative to its value after acquiring SFP in July

---

[123] *Id.*
[124] *Id.*
[125] *Id.* ¶ 75.
[126] *Id.* ¶ 76.
[127] *Id.*
[128] *Id.* ¶ 152.
[129] *Id.* ¶ 79.
[130] *Id.* ¶ 80.

2014.[131] During the intervening time, Verdesian's EBITDA had decreased by thirty-three percent.[132] The new Class P Units also had a distribution preference: in the event of a sale, Class P unitholders would receive double the Class P Unit price.[133] Class P Units' preference would supersede Class A Units' first priority in the event of a distribution from a liquidity event.[134] Verdesian's management was also allowed to participate in the Class P offering.[135]

On September 13, 2018, MKE and Bergevin sent a letter to Verdesian asking it to retract the offering of Class P Units.[136] Verdesian responded by letter on September 14, 2018.[137] Verdesian refused to retract the offering and indicated that it believed the offering to be fair because Class A unitholders could participate.[138] In separate communications with MKE, Verdesian indicated that it could find a buyer for MKE's Class A Units at price not to exceed $30.55.[139]

Verdesian closed the Class P offering on November 30, 2018.[140] Prior to the Offering, Paine Members and Buckeridge together held eighty-five percent of

---

[131] *Id.* ¶ 81.
[132] *Id.* ¶ 80.
[133] *Id.* ¶ 81.
[134] *Id.* ¶ 92.
[135] *Id.* ¶ 83.
[136] *Id.* ¶ 88.
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] *Id.* ¶ 90.

Verdesian's Class A Units.[141] Paine Members purchased 397,165 Class P Units, Verdesian's management (Grow and Avery) purchased 11,396 Class P Units, and Buckeridge, indirectly, purchased 5,201 Class P Units.[142] None of the minority Class A unitholders (that is, the non-Paine-related Class A unitholders) participated in the Class P offering.[143] Given the Class P Units' preference in the event of a sale, Verdesian would have to be sold for $560 million in order for all Class A unitholders to receive proceeds sufficient to fully return their investment.[144]

### H. MKE's Books and Record Demand

MKE made a books and record demand on Verdesian on October 12, 2017.[145] Verdesian made productions to MKE on November 28, 2017, December 5, 2017, December 7, 2017, and December 22, 2017.[146] These productions included audited financial statements, which had never been provided to MKE (or Bergevin) despite being required by the Operating Agreement.[147] Following the productions, Verdesian continued to fail to provide MKE and Bergevin with audited financial statements going forward; the audited financial statements for 2017 were due to them, per the Operating Agreement, on April 1, 2018.[148]

---

[141] *Id.* ¶ 91.
[142] *Id.* ¶ 90.
[143] *Id.*
[144] *Id.* ¶ 92.
[145] *Id.* ¶ 45.
[146] *Id.* ¶¶ 112–115.
[147] *Id.* ¶ 31.
[148] *Id.*

*I. Procedural History*

MKE and Bergevin filed a Complaint on October 9, 2018. They then filed the First Amended Complaint on January 14, 2019.[149] The Defendants filed a Motion to Dismiss the First Amended Complaint on March 1, 2019. I heard Oral Argument on the Motion to Dismiss on June 17, 2019, and considered the Motion submitted for decision on that date.

## II. ANALYSIS

The Plaintiffs bring four counts against the Defendants: breach of contract (the Operating Agreement), breach of fiduciary duty, fraud, and aiding and abetting. The Plaintiffs have brought the breach of Operating Agreement and breach of fiduciary duty counts (at least in part) derivatively. The Defendants have moved to dismiss the derivative claims under Court of Chancery Rule 23.1, the fraud claim under Rule 9(b), and all claims under Rule 12(b)(6). The Defendants further argue that many, if not all, of the Plaintiffs' claims are time barred. I analyze the derivative claims below.

*A. Derivative Claims*

The Plaintiffs' derivative claims arise from the SFP acquisition, the QC acquisition, management of Verdesian after those acquisitions (specifically: advance

---

[149] The Defendants had previously moved to dismiss the initial Complaint on November 16, 2018. D.I. 10.

21

sale of products in 2018 and 2019, changes in accrual practices, overspending on corporate perks, the hiring of certain executives, and changes in financial accounting practices of inventory), and Verdesian's maintenance of the fee agreement with Paine.[150] The Defendants argue that the derivative claims should be dismissed because the Plaintiffs failed to make a demand on the Board when, per the Defendants, it was not futile to do so. The Defendants further contend that many of the derivative claims are stale. The Defendants also argue that all of the derivative claims should be dismissed for failure to state a claim because the complained of actions by the Managers do not violate the Operating Agreement. I find this last argument compelling and accordingly dismiss all the derivate claims brought by the Plaintiffs under Rule 12(b)(6).

### 1. Assumption of Demand Futility

The Defendants have moved to dismiss the Plaintiffs' derivative claims, in part, because the Plaintiffs failed to first make a demand upon the Board of Managers as required by Court of Chancery Rule 23.1.[151] The Plaintiffs pled in their First Amended Complaint that such demand would have been futile.[152] Here five of the

---

[150] Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss Pls.' First Am. Compl., at 24–25, 51–52. To the extent that the Plaintiffs include the Defendants' failure to provide audited financial statements among their derivative claims, I disagree; such a claim is direct, not derivative. *See generally Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004) (stating standard). Accordingly, I reserve decision consistent with my treatment of direct claims in this Memorandum Opinion.
[151] Ct. Ch. R. 23.1.
[152] 6 *Del. C.* § 18-1003.

seven current Managers are either directors or executives of Paine; two former

Managers of Verdesian are or were directors or executives of Paine. Paine's indirect

majority ownership of, and contractual fee-generating relationship with, Verdesian

are central to the Plaintiffs' derivative claims. The Defendants argue that the

Managers involved in the transactions and activity questioned by the Plaintiffs do

not face a substantial likelihood of liability and are therefore capable of being

impartial. As a result, per the Defendants, the other Managers affiliated with Paine

who have since joined the Board can likewise be impartial, despite their business

and personal connections to other Paine-affiliated Managers. I need not decide the

question of demand futility because the Plaintiffs have not, as explained below, met

the comparatively lower standard for failure to state a claim.[153]

### 2. The Plaintiffs Have Failed to State Derivative Claims for Which Relief Can be Granted

In considering a motion to dismiss under Chancery Court Rule 12(b)(6), I

assume as true all well-pled allegations of fact in the complaint, and likewise accept

---

[153] *See In re Tyson Foods, Inc.*, 919 A.2d 563, 582 (Del. Ch. 2007) ("[Reviews of motions under Rule 12(b)(6), as opposed to 23.1,] differ, however, in the level of detail demanded of the plaintiffs' allegations and the directors at whom the inquiry is directed. In the context of a motion to dismiss under Rule 23.1, the Court considers the directors in office at the time a plaintiff brings a complaint, and plaintiffs may not rely upon the notice pleading standards of Rule 8(a). In the context of a motion to dismiss for failure to state a claim, on the other hand, the directors relevant to the Court's decision will usually be those in office at the time the challenged decision was made, and the standard, while perhaps more rigorous in derivative cases than in some others, does not reach so high a bar as Rule 23.1. In both cases this Court must make all inferences in favor of plaintiffs, but in the Rule 23.1 context such inferences may only be drawn from particularized facts, while in the former case I may draw from general, if not conclusory, allegations.").

as true all inferences that can be reasonably drawn in favor of the Plaintiffs from those well-pled allegations of fact.[154]

> ### a. The Verdesian Operating Agreement Imposes a Good Faith Standard

A contractual duty (if any) created by an LLC operating agreement is a matter of contract interpretation and therefore appropriate for review on a motion to dismiss.[155] The Operating Agreement here eschews common-law duties, and imposes contractual duties in their stead. I find that the sole duty imposed on Managers by the Operating Agreement is good faith.

Verdesian was formed as a Delaware limited liability company and, therefore, pursuant to Delaware law its operating or governing agreement may eliminate the fiduciary duties its managers would otherwise owe.[156] The Operating Agreement contains such a provision, which waives "any fiduciary duty of the Managers, so long as such Person acts in a manner consistent with [the Operating Agreement]."[157] In the place of common law fiduciary duties, the Operating Agreement imposes contractual duties on the Managers.

---

[154] *E.g. Himawan v. Cephalon, Inc.,* 2018 WL 6822708, at *2 (Del. Ch. Dec. 28, 2018).
[155] *See Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006) ("[T]he proper interpretation of language in a contract is a question of law. Accordingly, a motion to dismiss is a proper framework for determining the meaning of contract language.").
[156] 6 *Del. C.* § 18-1101(c).
[157] Operating Agreement § 6.9(b).

The Operating Agreement first states the standards that govern each Manager, who must act in "good faith, in a manner he reasonably believes to be in or not opposed to the best interests of the Company, and with the care that an ordinarily prudent person in a similar position would use under similar circumstances."[158] This tripartite standard, in its first part, imposes a subjective duty not to act in ways inimical to the entity, that is, "good faith." The second requirement provides that the Manager must act "in a manner he reasonably believes to be in or not opposed to the best interests of" Verdesian. This appears to contain good faith within the hedge of reason; that is, Managers must act in objective good faith. Finally, the Manager must employ the "care that an ordinarily prudent person in a similar position would use under similar circumstances." This is a simple negligence standard, which is a higher standard than the common law imposes on a corporate fiduciary. What is the purpose of this unusual recitation of disparate duties, in light of the rejection of common-law duties, and in terms of the contractual standard of review I must apply to managerial actions? Reading the Operating Agreement as a whole, as I must, it becomes clear that the ordinary prudence standard is aspirational; the balance of the Operating Agreement makes manifest that the Managers are only liable for action taken in bad faith.

---

[158] *Id*. § 6.4(b).

The Operating Agreement provides that Managers are explicitly expected and permitted to make conflicted decisions[159] and that the Members "waive any such conflicts of interest.[160] The Operating Agreement then eschews liability for a Manager's action "taken in good faith and reasonably believed to be in or not opposed to the best interests of the Company, or for errors of judgment, neglect or omission."[161] Therefore, while the contractual duty prescribed by the Operating Agreement includes an ordinary prudent person standard, any liability for an action that deviates from an ordinary prudence, but is nonetheless taken in good faith and is reasonably believed to be in or not opposed to the best interest of Verdesian, is exculpated. In this respect the Operating Agreement applies in a manner similar to the common-law duties in a corporation with an exculpation clause. The standards of conduct for a corporate fiduciary are the fundamental duties of loyalty and care, to act only in the corporate interest and in an informed manner. Liability for damages resulting from mere uninformed decisions may be exculpated under the DGCL,[162] however; if so, liability attaches only for breaches of loyalty and for actions taken in bad faith, and not for grossly negligent actions. Similarly, I find,

---

[159] *Id.* § 6.9(b).
[160] *Id.* ("The members hereby acknowledge that the Managers may or could have conflicts of interest to the extent that they are requested or obliged to make decisions or determinations as Members or Managers, in each case directly or indirectly with respect to, or that otherwise affect, the rights of members . . . the Members hereby waive any such conflicts of interest.").
[161] *Id.* § 6.4(d).
[162] 8 *Del. C.* §102(b)(7).

26

the Operating Agreement here directs the Mangers to operate in good faith and with ordinary care. It effectively exculpates Mangers for conflicted, negligent and other detrimental decisions, however, so long as taken in good faith.

In determining that good faith is the contractual duty established by the Operating Agreement, I have construed, as I must, the contract as a whole. I note that the Plaintiffs make a facile argument based on their contention that one provision of the Agreement revivifies common-law duties of loyalty and care. They point to the language waiving such duties: "[n]otwithstanding anything contained in this Agreement to the contrary, to the fullest extent permitted under the LLC Law, the Members of Verdesian hereby waive any fiduciary duty of the Managers, so long as such Person acts in a manner consistent with [the Operating Agreement]."[163] As I understand their theory, it is this: the company has performed poorly, raising an inference at least of negligence; negligent conduct is not "consistent" with the standard of care—ordinary prudence—provided for in the Agreement; thus, on a finding that negligence is implied, I must impose the default duties, and the duty of care standard—gross negligence—becomes the standard of review. Moreover, despite the express waiver, conflicted decisions must be afforded entire fairness review.

---

[163] Operating Agreement § 6.9(b).

The Defendants contend that similar arguments have been rejected by our courts, and point to cases following *Norton v. K-Sea Transportation Partners, L.P.*[164] I do not find that case dispositive, because the "so long as" clauses there refer to the subjective beliefs of the fiduciary, not (as here) objective consistency with the Agreement. I find, however, that Plaintiff's reading of the Operating Agreement would be nonsensical. It would eviscerate, and make surplus, the good faith standard and conflict-waiver provisions of the Operating Agreement. No reasonable drafter, or reader, would construe an explicit waiver of all duties but good faith—including a waiver of conflict and gross negligence—to be contingent on the actor avoiding *simple negligence*. The natural reading of the "so long as . . . consistent" language is that the waiver of duties applies to actions taken consistent with those managerial tasks assigned the Managers, and that it is not directed at a standard of care. There is no ambiguity here; only multiple *reasonable* readings of contract language create ambiguity,[165] and, in the context of the agreement as a whole, the Plaintiffs' reading is not reasonable. I further note that the Plaintiffs appear to concede (in their First Amended Complaint, in briefing, and at Oral

---

[164] 67 A.3d 354 (Del. 2013).
[165] *ConAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 69 (Del. 2011) ("[W]hen we may reasonably ascribe multiple and different interpretations to a contract, we will find that the contract is ambiguous.") (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010)).

Argument) that bad faith is the operative contractual standard.[166]  The Plaintiffs' argument, nonetheless, was both clever and contextually based.  Bad drafting leads to such arguments.

Reading the Operating Agreement as a whole, I find that in order to be liable for breach of the contractual duty, a Manager must act in bad faith.  That is the standard under which I review the actions of the Managers to determine if the derivative portions of the complaint state a claim.

> b. Verdesian's Acquisition of Specialty Fertilizer Products, LLC

Verdesian acquired SFP in July 2014.  The Defendants argue that the Plaintiffs' derivative claim regarding that acquisition is stale because the statute of limitations has lapsed.  The Plaintiffs contend that the statute of limitations should be tolled.  I need make no determination on tolling because I find that, in any event, the Plaintiffs have failed to plead a claim on which relief can be granted; that is, the Plaintiffs have failed to plead facts leading to a reasonable inference that the acquisition of SFP was done in bad faith.

The Plaintiffs allege that the Managers approved Verdesian's acquisition of SFP in bad faith because the Managers had knowledge of the KPMG Report and United Suppliers' testimonial, which showed that SFP had "stuffed the channel" and

---

[166] First Am. Compl. ¶¶ 128–44; Pls.' Answering Br. in Opp'n to Defs.' Mot. to Dismiss Pls.' First Am. Compl., at 54; June 17, 2019 Oral Arg. Tr. 64:7–67:23.

29

thereby inflated its financial results for 2013. The Managers, through their positions at Paine, indirectly had an interest in the transaction because Paine received transaction fees for acquisitions and management fees based on Verdesian's financial results. The SFP acquisition was sizeable. According to the Plaintiffs, the Managers were driven to acquire SFP because of the large transaction fee, and the increased management fee which would accrue to Paine associated with consolidated financial performance of Verdesian and SFP.

The logical conclusion of the Plaintiffs' theory is that the Defendants were driven to acquire a company that they knew would immediately decrease in value, in order to realize a one-time transaction fee and a larger management service fee for the controller. Per the Plaintiffs, this self-dealing by the Defendants was not permissible under the Operating Agreement, even with its conflict of interest provisions. In a common law fiduciary duty case conflicted transactions are inherently suspect,[167] but here the applicable contractual standard allows the Managers to make decisions that benefit themselves. Therefore, the fact that the Managers benefitted or acted to increase the benefit they could realize (through their positions at Paine to whom the benefits ran) does not by itself indicated a breach of

---

[167] *See Weinberger v. UOP*, Inc., 457 A.2d 701, 710 (Del. 1983) ("When directors of a Delaware corporation are on both sides of a transaction, they are required to demonstrate their utmost good faith and the most scrupulous inherent fairness of the bargain.").

30

their contractual duty to Verdesian, unless the decision taken was inimical to Verdesian's interest.

In order to breach the Operating Agreement, the SFP acquisition must have been against the best interest of Verdesian viewed from the perspective of the Managers. With the benefit of hindsight, the Plaintiffs argue that SFP has not performed well, but that does not imply that the Managers did not believe at the time that the acquisition of SFP was in the best interests (or not opposed to the best interests) of Verdesian. The Plaintiffs' argument that the Managers approved a bad acquisition in the interests of Paine, as the Defendants point out, has a fatal flaw: Paine (through its affiliates) owned *over seventy percent* of Verdesian, the company the Managers, per Plaintiffs theory, intended to reduce in value with the acquisition of SFP. This would simply not be rational self-interested behavior on behalf of Paine or the Managers at Verdesian's expense. It is not reasonable to infer bad faith from the SFP transaction, based on the Mangers' desire to drive fees to Paine, because the value of the transaction and management service fees to Paine is dwarfed by the potential loss to Paine from Verdesian's acquisition of SFP for several hundred million dollars. Furthermore, I note, the Paine affiliates themselves participated in the equity financing related to the SFP acquisition. The theory that the Managers caused Verdesian to acquire SFP in bad faith, on these grounds, is not plausible.

31

The Plaintiffs theorized at oral argument that Paine was positioning Verdesian for sale and had bought SFP knowing of its inflated results, with the intent to offload it (as part of a sale of Verdesian a whole), presumably before SFP sales went bust the following year.[168] Under this theory, Verdesian acquired SFP in July 2014, creating a $6 million transaction fee for Paine, with the intent to sell Verdesian before financial results from 2014 (which, I note, was at that point half over) showed that the results from 2013 had been inflated and were not sustainable. This theory stretches credulity. First, the Managers would have to ensure that any sale of Verdesian would occur quickly, within months, if not weeks, of completing the SFP acquisition, so that the 2014 financial results did not reveal the one-time effect of stuffing the channel. Second, and even more problematic, the Plaintiffs' argument involves drawing an inference that the Managers not only knowingly (and intentionally) paid too much for SFP, but also planned to sell SFP (as part of Verdesian) at a profit via fraud, to a buyer who would not discover the channel stuffing through its own due diligence. This is simply not, to my mind, a reasonable inference. I note that the Plaintiffs in their First Amended Complaint fault the Managers for not performing sufficient due diligence on SFP,[169] and yet, the

---

[168] June 17, 2019 Oral Arg. Tr. 73:6–73:21.
[169] First Am. Compl. ¶ 44.

Plaintiffs' theory rests on the Managers' confidence that they could find a buyer who would perform even *less* diligence.[170]

The Plaintiffs contend that a prominent red flag existed for Verdesian's acquisition of SFP in the form of warnings that the revenue generated in 2013, through fall early fill and bulk sales programs, would not be repeated the following year. The Plaintiffs have not pled that the Defendants overlooked this red flag (which would not lead to liability on the part of the Managers). Instead, they alleged that the potential for inflated 2013 sales numbers was known and disregarded in bad faith, for the purpose of ensuring Paine would reap fees from the acquisition. Under Rule 12(b)(6) I must draw reasonable inferences in favor of the Plaintiffs, who must plead a breach of the contractual standard—bad faith—in the Operating Agreement to survive the Defendants' Motion. The Plaintiffs, however, have failed to adequately plead bad faith given the Managers' (and Paine's) financial interest in the acquisition being valuable to Verdesian. The Plaintiffs' theory of bad faith, that the Managers acted against company interest to benefit the controller, which stood to be harmed the most by a bad acquisition, relies on an unreasonable inference that

---

[170] I note that, had this been the Managers' plan and had it been successful, the Plaintiffs themselves would have shared in the ill-gotten gain.

I cannot draw. Accordingly, the derivative claim related to the SFP acquisition is dismissed.[171]

### c. Verdesian's Acquisition of QC Corporation

Verdesian acquired QC in September 2014. The Plaintiffs allege that this acquisition was undertaken by the Managers in bad faith to transfer an underperforming company with environmental liabilities from Paine to Verdesian, and that the Managers were additionally motivated by the fees the transaction would generate for Paine.[172] As with the SFP acquisition, the Defendants argue that the Plaintiffs' claim related to QC is stale, and otherwise should be dismissed under Rule 12(b)(6). I find the latter supports dismissal, and thus need make no determination on the former.

While the QC transaction presents a conflict of interest for the Paine appointed Managers, that conflict is permissible according the Operating Agreement. The Plaintiffs do not argue otherwise. Instead, the Plaintiffs allege that the Managers approved the transaction in bad faith to transfer liabilities borne completely by Paine (as the previous owner of QC) to Verdesian (of which Paine is the indirect majority owner and would therefore bear the majority, but less than the whole, of any

---

[171] Nothing in this Memorandum Opinion should be read as determinative of the Plaintiffs' direct claim of fraud based on the Defendants' sale of equity relating to the SPF acquisition, on which I reserve decision.

[172] First Am. Compl. ¶ 133. In briefing and at Oral Argument, the Defendants argue that no transaction fee was paid by Verdesian in relation to the QC acquisition.

liabilities). The Plaintiffs further allege that the Managers were motivated by fees and bonuses to be paid to Paine (and therefore themselves). Proof that the transaction was not in the best interest of Verdesian, per the Plaintiffs, is in QC's post-acquisition performance. The Plaintiffs, however, make no factual allegation as to what that performance has been, or that the acquisition, net, harmed Verdesian. They only allege the liabilities, and note that QC carries an $18 million intercompany loan. They are unable to point to facts indicating that Verdesian overpaid for QC, and their allegations of bad faith are purely conclusory.

The fact that the Managers acquired a company that had liabilities does not by itself suggest that the acquisition was inimical to the best interests of Verdesian. While a conflicted transaction is normally suspect, the contractual standard that governs here specifically allows such activity by the Managers. Without more, I am unable to draw an inference that the Managers acted in bad faith, and any derivative claim associated with the acquisition of QC is dismissed under Rule 12(b)(6).

### d. Mismanagement

The Plaintiffs have alleged that the Managers have made a number of poor decisions. These decisions include hiring choices, continued use of advance sales and discounts, changes in certain financial accounting practices, and lavish spending. I refer to these derivative claims as the "mismanagement" claims. The Plaintiffs make conclusory allegations that these decisions were made in bad faith

and out of self-interest. Furthermore, the Plaintiffs consistently argue that the Managers are, for all intents and purposes, beholden to (if not direct stand-ins for) Paine. However, I note, Paine itself stands to lose to the extent Verdesian is mismanaged.

The Managers have made decisions with which the Plaintiffs do not agree, and over the last few years Verdesian's performance has declined, including its financial performance (which, I note, diminishes Paine's management fees). It does not, however, reasonably follow that these decisions were made knowingly against the best interests of Verdesian. The Plaintiffs suggest no motive for bad faith on what they contend is mismanagement by the Managers, save loyalty to Paine. Paine is the majority owner of Verdesian and benefits when Verdesian increases it value; Paine also benefits from management service fees tied to Verdesian's financial performance. Intentional mismanagement of Verdesian would harm both of Paine's sources of gain from Verdesian. As a result, the inference that the Plaintiffs ask me to draw—that the Managers' decisions were taken in subjective bad faith out of loyalty to Paine—is not reasonable on these facts. What is left is simply an allegation that the Defendants are poor or incompetent mangers, a fact, if true, that does not subject them to liability to Verdesian. The mismanagement derivative claims are therefore dismissed under Rule 12(b)(6).

e. Continuing to pay Management Fees

The Plaintiffs argue that the Managers should have caused Verdesian to withdraw from its agreement with Paine, under which Verdesian pays Paine management service fees based on Verdesian's financial performance. The Plaintiffs' derivative claim for failure to withdraw from the contract with Paine rests in large part on the allegation that the contract provided unwarranted benefits to Paine (related to the SFP acquisition, the QC acquisition, and the allegations of mismanagement) without benefit to Verdesian. I have already found that the Plaintiffs have not sufficiently pled the bad faith necessary to show these acquisitions and actions violated the Operating Agreement. The First Amended Complaint does not allege, let alone plead in a non-conclusory way, that the Managers had the opportunity to withdraw from the Paine management contract or that breach would have been efficient. Finally, the Complaint does not disclose that the arrangement with Paine, net, was inimical to Verdesian. I cannot, therefore, infer bad faith. This derivative claim is therefore dismissed for failure to state a claim.

*B. Direct Claims*

The Plaintiffs have also brought direct claims against the Managers. Some of these claims, it appears, are directly related to the actions supporting the derivative actions dismissed above; presumably, my decision here should apply to those direct claims. In addition, the Plaintiffs bring claims unrelated to those above: they

37

contend that the Managers breached the Operating Agreement by failing to provide the Plaintiffs with audited financial statements, committed fraud in relation to soliciting equity financing for the SFP acquisition, and breached the Operating Agreement with the Class P Unit issuance.

So as to avoid redundant and advisory opinions, it would be helpful to have the parties consult and inform me, in light of my decision here with respect to the standard of review and the derivative claims, which direct claims remain. I will then address those claims promptly, based on the existing briefing.

## III. CONCLUSION

For the forgoing reasons, I find that the Plaintiffs' derivative claims brought on behalf of Verdesian fail under Rule 12(b)(6), and accordingly are dismissed. The parties should confer and inform me for which direct claims the Motion to Dismiss remains pending; those claims will be addressed in a separate opinion.